IN THE CHANCERY COURT FOR THE STATE OF TENNESSEE
TWENTIETH JUDICIAL DISTRICT AT NASHVILLE, DAVIDSON COUNTY

| | | |
|---|---|---|
| CHRISTY WILKERSON, | ) | |
| | ) | |
| *Plaintiff*, | ) | Case No. _____ |
| | ) | |
| v. | ) | JURY DEMANDED |
| | ) | |
| TENNESSEE DEPARTMENT OF | ) | |
| TRANSPORTATION, JASON BAKER, in his | ) | |
| individual capacity, and COMMISSIONER | ) | |
| WILL REID, in his individual capacity, | ) | |
| | ) | |
| *Defendants*. | ) | |

## COMPLAINT

Plaintiff, Christy Wilkerson ("Ms. Wilkerson" or "Plaintiff"), alleges the following claims against the Tennessee Department of Transportation ("TDOT"), Jason Baker, in his individual capacity ("Mr. Baker"), and Commissioner Will Reid, in his individual capacity ("Commissioner Reid") (collectively, "Defendants"):

### <u>INTRODUCTION</u>

1. This is an action for discrimination and retaliation in violation of 42 U.S.C. § 1983 and the Tennessee Human Rights Act ("THRA"), Tenn. Code Ann. § 4-21-101, *et seq.*

2. Specifically, after enduring years of harassment and assault while employed by TDOT, Ms. Wilkerson—the only female on her crew—bravely spoke up and reported the abuse.

3. In response, Defendants terminated her while her abusers remain employed by TDOT.

### <u>PARTIES, JURISDICTION, AND VENUE</u>

4. Plaintiff is a female citizen of the State of Tennessee.

5.     Defendant TDOT is a state agency.

6.     Defendant Jason Baker is the Director/Assistant Chief Engineer of TDOT's Region 4.

7.     Commissioner Will Reid is Tennessee's Commissioner of Transportation.

8.     This Court has jurisdiction over the subject matter of this action pursuant to Tennessee Code Annotated sections 16-11-101 and 4-21-311(a).

9.     Venue is proper in this Court pursuant to Tennessee Code Annotated section 4-4-104.

## STATEMENT OF FACTS

10.     Plaintiff began working for TDOT in 2017. At the time of her termination, she was a Transportation Worker 2.

11.     During her employment, Plaintiff worked on a crew of approximately nine employees, all of whom were male. The crew primarily worked in Hardin County, Tennessee.

12.     The crew's main home base was at a TDOT facility in Crump, Tennessee.

13.     Throughout the entirety of her employment, Plaintiff's work environment was riddled with sexism and harassment, as described below.

14.     The other members of the crew refused to call Plaintiff by her name and instead called her "Sally."

15.     When Plaintiff began working for TDOT, the crew's supervisor was Terry Haggard ("Mr. Haggard"). Frank Music ("Mr. Music") then replaced Terry Haggard. Mr. Music enabled the sexist and harassing work culture among Plaintiff's crew. On his first day as supervisor, he implied Plaintiff got a job with TDOT by performing sexual favors. In or around summer 2024, Jesse Thompson ("Mr. Thompson") replaced Mr. Music as the crew's supervisor.

2

16. Around the same time that Mr. Thompson replaced Mr. Haggard, Cody Dendy ("Mr. Dendy"), a member of Plaintiff's crew, became the crew leader.

17. Nearly immediately after Plaintiff started working for TDOT, she began to be sexually harassed and assaulted by Mr. Dendy and several other males who worked on the crew.

18. On multiple occasions, Mr. Dendy exposed his penis to Plaintiff.

19. For example, in the summer of 2024, Plaintiff was assigned to work with Mr. Dendy on a slope mowing assignment.

20. While Plaintiff and Mr. Dendy were alone in the TDOT truck in Burnt Church near Savannah, Tennessee, Mr. Dendy urinated outside near Sunny Hill Cemetery on Highway 203 while Plaintiff sat in the TDOT truck.

21. When he was done urinating, Mr. Dendy opened the door to the TDOT truck next to Plaintiff's seat. As he stood inches away from Plaintiff, his penis was exposed. He grabbed Plaintiff's hand and tried to force her to touch his penis while pushing himself against her. As he did this, he made statements like, "It's big and you like it, Sally."

22. At the time of this incident in Burnt Church, Mr. Dendy was a crew leader.

23. On multiple occasions, and in front of most of the other crew members, Mr. Dendy grabbed Plaintiff's hair and jerked her head back.

24. On another occasion, while Plaintiff was driving a TDOT dump truck and Mr. Dendy was a passenger, he reached over to Plaintiff and put his hand down her shirt and into her bra.

25. Plaintiff began screaming, "get off me! Stop it!" Mr. Dendy responded, "Just let me touch it."

26. On at least a dozen occasions, Mr. Dendy unhooked Plaintiff's bra while he was standing behind her. On at least one of these occasions, Mr. Dendy unhooked Plaintiff's bra while they were walking down a hill, and when Plaintiff looked back at Mr. Dendy in shock, she stepped into a hole and twisted her ankle. As a result, Plaintiff began wearing sports bras to work.

27. Plaintiff is approximately eighteen years older than Mr. Dendy, and Mr. Dendy made suggestive comments to Plaintiff about enjoying engaging in sexual relationships with older women.

28. For example, on one occasion, while Plaintiff and Mr. Dendy were alone in a TDOT vehicle and Mr. Dendy was driving, he turned down an isolated road and parked by a creek. He looked at Plaintiff and said, "I just want to let you know I have been with older women." Plaintiff was incredibly frightened because she was alone with Mr. Dendy in the car and he was in the driver's seat.

29. After this incident, Plaintiff told Mr. Haggard she did not want to ride alone with Mr. Dendy. Mr. Haggard, however, did not ask her why, nor did he ensure Plaintiff did not ride alone with Mr. Dendy.

30. On another occasion, while traveling down a service road with Plaintiff, Mr. Dendy began asking Plaintiff to "do a quickie" with him.

31. The TDOT facility in Crump (where the crew was based) had a television. On one occasion, while the crew was at the TDOT facility in Crump, Mr. Dendy put pornography featuring octogenarians on the television in front of other crew members.

32. On dozens of occasions throughout her employment, Mr. Dendy simulated sex on the other members of the crew in front of Plaintiff. Specifically, when Mr. Dendy saw another crew member bent over, he would grab the crew member's hips and simulate engaging in sex with

4

the crew member. On at least one occasion, Mr. Dendy simulated sex on Plaintiff while violently pushing her into another crew member.

33. Mr. Dendy frequently spent long stretches in the restroom during working hours, and crew members (including Plaintiff) could hear Mr. Dendy watching pornography in the bathroom.

34. As a result of this environment, Plaintiff was fearful at work. On certain occasions, the crew was required to sleep overnight in the building due to weather events (*i.e.*, snow). On one such occasion, Plaintiff woke up to find Mr. Dendy unzipping her jacket. After that, if Plaintiff needed to stay overnight, she locked herself in her truck and slept there, and placed blankets in the windows so the other crew members could not look inside.

35. Mr. Dendy and the other crew members frequently discussed Plaintiff's underage teenage daughter in disgusting and obscene terms. For example, they said things like Plaintiff's daughter "has big boobs like her momma." Mr. Music was within earshot when they made those statements.

36. While in TDOT uniforms and traveling in TDOT vehicles, Mr. Dendy and other crew members would point at women and say things like, "I would f**k her, would you? Would you, Sally?"

37. When the crew ate lunch together at restaurants, and while wearing TDOT uniforms, Mr. Dendy and other crew members made statements about whether they would "f**k" their waitress loudly enough that the waitress could hear them. On multiple occasions, Plaintiff had to apologize to waitresses for the crew members' lewd comments.

38. During her employment, Plaintiff developed a close working relationship with her coworker, Donnie Turnbow ("Mr. Turnbow").

39. Mr. Turnbow and Plaintiff were frequently paired together as partners to perform work in the field.

40. Mr. Turnbow tried his hardest to protect Plaintiff from the ongoing harassment but could not always do so. Plaintiff became extremely fearful to be at work if Mr. Turnbow was absent.

41. The harassment and assault described above made Plaintiff feel uncomfortable, disgusted, upset, and humiliated.

42. The managerial and/or supervisory employees who witnessed and/or participated in the harassment and assault described above did nothing to prevent or report those incidents of sexual harassment.

43. Despite this working environment, Plaintiff was excellent at her job.

44. Plaintiff was, however, frequently assigned to perform flagger duties, even though she could perform other, more challenging duties.

45. Plaintiff frequently asked to perform job duties other than flagger duties.

46. On the occasions Plaintiff was allowed to perform more challenging duties, she excelled at them.

47. After Mr. Dendy exposed himself in Burnt Church, however, Mr. Dendy (the crew leader) refused to consider giving Plaintiff other job duties and would only let her perform flagger duties.

48. On or around February 2025, Jason Fielder ("Mr. Fielder"), one of Plaintiff's coworkers on the crew, asked Plaintiff if Mr. Dendy showed his penis to her in Burnt Church.

49. Plaintiff was taken aback by this question, but truthfully responded "yes."

50. Mr. Fielder responded, "well that explains why he [Mr. Dendy] said we need to get you fired or make you quit."

51. Plaintiff told Mr. Fielder she kept a journal that contained some references to Mr. Dendy's assaults and harassment.

52. At this time, Mr. Dendy was attempting to get promoted to the position of Supervisor. He began manipulating newer crew members by telling them he would give them favors (*e.g.*, favorable work assignments) in exchange for their "loyalty" to him.

53. Shortly thereafter, on March 4, 2025, Mr. Dendy confronted Plaintiff. He said something along the lines of, "I heard you have a journal about me" and reminded her he was trying to get a promotion. Plaintiff responded that yes, she wrote things down in a journal that he had done to her. She said knew what he had done to her over the years. She said she just wanted to be treated fairly.

54. On or around March 27, 2025, Plaintiff told Steve Morgan ("Mr. Morgan"), the Team Lead over Henderson, Hardin, and Decatur Counties, about Mr. Dendy exposing himself to her in Burnt Church and his recent threats to her job.

55. Plaintiff told Mr. Morgan she did not want him to report the incidents to HR, because she feared further retaliation.

56. Several days later, Plaintiff met with Mr. Morgan and Cody Roberts (another Supervisor). During that meeting, Mr. Morgan told Plaintiff he was required to report Plaintiff's complaints to HR and had done so the day before. He told Plaintiff that HR planned to investigate Plaintiff's complaints.

57. During that meeting, Plaintiff stated that Mr. Dendy behaved inappropriately throughout her employment.

58. During the meeting, Plaintiff expressed concerns she would lose her job because of her complaints.

59. During the meeting, Plaintiff also complained about only being permitted to conduct flagging duties, whereas the males on the crew got to perform many other types of duties.

60. During the meeting, Plaintiff also stated she suspected Mr. Dendy did not assign her to duties other than flagging as punishment for refusing his advancements in Burnt Church.

61. During the meeting, Mr. Roberts stated he would have "killed" Mr. Dendy if he exposed himself to his daughter or his wife.

62. During the meeting, Plaintiff expressed concern that other crewmembers would not be truthful during the investigation.

63. Shortly thereafter, Plaintiff met with TDOT HR employees Katie Cantley, Haley Sprague, and Jennifer Greathouse regarding her complaints.

64. During that meeting, one of the TDOT HR employees asked Plaintiff if it was possible that Mr. Dendy was just "messing around" when he exposed his penis.

65. During the meeting, Plaintiff told the TDOT HR employees the crewmembers behaved inappropriately and she was treated differently because she was a woman.

66. During the meeting, Plaintiff told the TDOT HR employees she thought Mr. Dendy was trying to get her fired because she refused to touch his penis.

67. Mr. Turnbow participated in the investigation as a witness and truthfully recounted the harassment and abuse Plaintiff endured during her employment.

68. On July 16, 2025, Plaintiff received a call from Mr. Roberts and Mike Welch, TDOT's Director of Operations, to tell her she was terminated.

8

69. Plaintiff then received a letter, dated July 16, 2025, stating her "employment with [TDOT] as a Transportation Worker 2 is terminated effective Thursday, July 17, 2025."

70. The letter states that after Mr. Morgan reported Plaintiff's complaints to TDOT HR, TDOT HR conducted an "extensive investigation" and concluded that *Plaintiff—not her abusers*—violated TDOT Policy.

71. The letter states that Mr. Baker recommended Plaintiff's termination, and Commissioner Reid concurred in the recommendation.

72. The alleged policy violations were either fabricated and/or were based on behavior that her male coworkers also engaged in but were not disciplined for.

73. For example, the letter cites Plaintiff's alleged use of "profane language" in the workplace as a justification for her termination. All the male crew members, however, frequently used profanity in the workplace without discipline.

74. Plaintiff was never given an opportunity to respond to the allegations in the July 16, 2025 letter.

75. The same day, Mr. Turnbow, who advocated for Plaintiff, was also terminated.

76. Plaintiff's harassers and abusers, including Mr. Dendy, remain employed by TDOT.

**COUNT ONE: SEXUAL HARASSMENT IN VIOLATION OF THE TENNESSEE HUMAN RIGHTS ACT, TENN. CODE ANN. § 4-21-101, *et seq.*
*Against Defendant Tennessee Department of Transportation***

77. Plaintiff incorporates Paragraphs 1 through 76 above as if each has been fully restated herein.

78. As a female, Plaintiff is a member of a protected class under the Tennessee Human Rights Act.

9

79. Plaintiff was subjected to unwelcome sexual conduct and throughout the entirety of her employment.

80. The unwanted conduct arose from sexual interest and included explicitly sexual advances.

81. When Plaintiff refused Mr. Dendy's advances, he gave her less favorable assignments in his capacity as crew leader.

82. TDOT knew about the harassment because managerial/supervisory employees witnessed and/or participated in the harassment.

83. TDOT should have known about the harassment because of the pervasiveness and openness of the harassment endured by Plaintiff. Plaintiff was openly harassed almost every time she worked. The harassment occurred in open areas of the workplace.

84. TDOT knew about the harassment because Plaintiff reported it to TDOT.

85. TDOT failed to take prompt and appropriate remedial action to stop the harassment.

86. As a result of these acts and omissions, TDOT violated the Tennessee Human Rights Act, Tenn. Code Ann. § 4-21-101, *et seq.*

87. As a result of TDOT's violation of the THRA, Plaintiff is entitled to compensatory damages in an amount to be determined at trial, back pay, interest on back pay, front pay, other equitable relief, and reasonable costs and attorneys' fees.

**COUNT TWO: SEX DISCRIMINATION IN VIOLATION OF THE TENNESSEE HUMAN RIGHTS ACT, TENN. CODE ANN. § 4-21-101, *et seq.***
*Against Defendant Tennessee Department of Transportation*

88. Plaintiff incorporates Paragraphs 1 through 87 above as if each has been fully restated herein.

89.     As a female, Plaintiff is a member of a protected class under the Tennessee Human Rights Act.

90.     Plaintiff was qualified for the job of Transportation Worker 2.

91.     Plaintiff was subjected to adverse employment actions because of her sex, including less favorable work assignments.

92.     Plaintiff was terminated for allegedly engaging in behaviors that her male coworkers frequently engaged in. Her male coworkers, however, were not punished for engaging in these behaviors.

93.     As a result of these acts and omissions, TDOT violated the Tennessee Human Rights Act, Tenn. Code Ann. § 4-21-101, *et seq.*

94.     As a result of TDOT's violation of the THRA, Plaintiff is entitled to compensatory damages in an amount to be determined at trial, back pay, interest on back pay, front pay, other equitable relief, and reasonable costs and attorneys' fees.

**COUNT THREE: RETALIATION IN VIOLATION OF THE TENNESSEE HUMAN RIGHTS ACT, TENN. CODE ANN. § 4-21-101, *et seq.***
***Against Defendant Tennessee Department of Transportation***

95.     Plaintiff incorporates Paragraphs 1 through 94 above as if each has been fully restated herein.

96.     Plaintiff engaged in protected activity under the THRA when she reported the harassment and discrimination described above to TDOT.

97.     TDOT knew that Plaintiff engaged in protected activity.

98.     After Plaintiff engaged in protected activity, Mr. Dendy gave her less favorable work assignments.

99.     After Plaintiff engaged in protected activity, TDOT terminated Plaintiff.

11

100. There was a causal connection between Plaintiff's protected activity and her less favorable work assignments.

101. There was a causal connection between Plaintiff's protected activity and her termination.

102. As a result of these acts and omissions, TDOT violated the Tennessee Human Rights Act, Tenn. Code Ann. § 4-21-101, *et seq.*

103. As a result of TDOT's violation of the THRA, Plaintiff is entitled to compensatory damages in an amount to be determined at trial, back pay, interest on back pay, front pay, other equitable relief, and reasonable costs and attorneys' fees.

**COUNT FOUR: RETALIATION IN VIOLATION OF THE FIRST AMENDMENT TO THE UNITED STATES CONSTITUTION, 42 U.S.C. § 1983**
*Against Defendants Jason Baker, in his individual capacity,*
*and Commissioner Will Reid, in his individual capacity*

104. Plaintiff incorporates Paragraphs 1 through 103 above as if each has been fully restated herein.

105. Plaintiff engaged in constitutionally protected speech when she complained about the sexual assault, sexual harassment, sex discrimination, and retaliation she experienced while working at TDOT.

106. Plaintiff engaged in constitutionally protected speech when she participated in TDOT HR's investigation into her complaints.

107. Plaintiff's speech was on a matter of public concern, as its content was related to sexual assault, sexual harassment, sex discrimination, and retaliation within TDOT.

108. Plaintiff's speech was not pursuant to her official duties.

109. Plaintiff's interest as a citizen in speaking on these matters and bringing the rampant sexual assault, sexual harassment, sex discrimination, and retaliation at TDOT to light outweighed

TDOT's interest as an employer in promoting the efficiency of the public service it performs through its employees.

110. Mr. Baker and Commissioner Reid, acting under color of state law, terminated Plaintiff because she exposed the sexual assault, sexual harassment, sex discrimination, and retaliation at TDOT.

111. Plaintiff's termination would deter a person of ordinary firmness from engaging in constitutionally protected speech.

112. Mr. Baker and Commissioner Reid retaliated against Plaintiff for exercising her First Amendment right to free speech.

113. Plaintiff had a clearly established right to exercise her free speech rights without retaliation, and a reasonable officer in Mr. Baker and/or Commissioner Reid's position would have known that this retaliation would violate clearly established law.

114. As a result of these actions, Mr. Baker and Commissioner Reid retaliated against Plaintiff for exercising her First Amendment right to free speech in violation of 42 U.S.C. § 1983.

115. As a result of Mr. Baker and Commissioner Reid's violations of § 1983, Plaintiff is entitled to compensatory damages in an amount to be determined at trial, back pay, interest on back pay, front pay, other equitable relief, and reasonable costs and attorneys' fees.

**COUNT FOUR: RETALIATION IN VIOLATION OF THE FIRST AMENDMENT TO THE UNITED STATES CONSTITUTION, 42 U.S.C. § 1983**
*Against Defendant Tennessee Department of Transportation*

116. Plaintiff incorporates Paragraphs 1 through 115 above as if each has been fully restated herein.

117. Plaintiff engaged in constitutionally protected speech when she complained about the sexual assault, sexual harassment, sex discrimination, and retaliation she experienced while working at TDOT.

118. Plaintiff engaged in constitutionally protected speech when she participated in TDOT HR's investigation into her complaints.

119. Plaintiff's speech was on a matter of public concern, as its content was related to sexual assault, sexual harassment, sex discrimination, and retaliation within TDOT.

120. Plaintiff's speech was not pursuant to her official duties.

121. Plaintiff's interest as a citizen in speaking on these matters and bringing the rampant sexual assault, sexual harassment, sex discrimination, and retaliation at TDOT to light outweighed TDOT's interest as an employer in promoting the efficiency of the public service it performs through its employees.

122. Mr. Baker and Commissioner Reid, acting under color of state law, terminated Plaintiff because she exposed the sexual assault, sexual harassment, sex discrimination, and retaliation at TDOT.

123. Plaintiff's termination would deter a person of ordinary firmness from engaging in constitutionally protected speech.

124. TDOT retaliated against Plaintiff for exercising her First Amendment right to free speech.

125. TDOT failed to adequately train Mr. Baker and/or Commissioner Reid on the laws prohibiting retaliation.

126. As a result of these actions, TDOT retaliated against Plaintiff for exercising her First Amendment right to free speech in violation of 42 U.S.C. § 1983.

14

127.    As a result of TDOT's violations of § 1983, Plaintiff is entitled to compensatory damages in an amount to be determined at trial, back pay, interest on back pay, front pay, other equitable relief, and reasonable costs and attorneys' fees.

WHEREFORE, Plaintiff prays for the following relief:

1.  A jury of six to try her claims.

2.  Entry of judgment in favor of Plaintiff, and against Defendants, for compensatory damages in an amount to be proven at trial.

3.  Entry of judgment in favor of Plaintiff for back pay, front pay, and other equitable relief.

4.  An award of Plaintiff's costs, reasonable attorneys' fees, and pre- and post-judgment interest.

5.  Any other legal or equitable relief to which Plaintiff may be entitled.

Dated: April 7, 2026                    Respectfully submitted,

                                        **JESSE HARBISON LAW PLLC**

                                        /s/ *Jesse Ford Harbison*
                                        Jesse Ford Harbison, BPR No. 032105
                                        613 Woodland Street
                                        Nashville, Tennessee 37206
                                        (629) 201-7284
                                        jesse@jesseharbisonlaw.com

                                        *Counsel for Plaintiff*